## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **Mark R. Goodwin and** | * | |
| **Cutting Edge Surgical Co., Inc.** | | |
| **d/b/a Cutting Edge Surgical, Inc.** | * | |
| | | |
| **Plaintiffs** | * | |
| | | |
| **v.** | * | **Civil Action No.:** |
| | | |
| **The Johns Hopkins University,** | * | |
| **Muyinatu Bell and Joshua Shubert,** | | |
| | * | |
| **Defendants.** | | |

\* \* \* \* \* \* \* \* \* \*

### COMPLAINT

Plaintiffs Mark R. Goodwin and Cutting Edge Surgical, Co., Inc., d/b/a Cutting Edge Surgical, Inc. ("CES" or "Cutting Edge Surgical") (collectively "Plaintiffs" or "Mr. Goodwin,") by and through their attorneys, for their Complaint against Defendants The Johns Hopkins University ("JHU")[1], Dr. Muyinatu Bell ("Defendant Bell") and Mr. Joshua Shubert ("student Shubert") (collectively "JHU" or "Defendants") hereby allege: Count One Breach of Contract, Count Two: Fraudulent Inducement, Count Three: Conversion, Count Four: Unfair Competition (Maryland common law), Count Five: Unfair Competition (Lanham Act) and Count Six: Declaratory Judgment that Mr. Goodwin is a co-owner of the PA-IONI™ technology[2] disclosed

---

[1]    As used in this Complaint, Defendant JHU expressly includes Johns Hopkins Technology Ventures ("JHTV"). Plaintiffs do not separately name JHTV as a Defendant as they are part of JHU. (https://www.jhu.edu/research/innovation/ (last accessed April 24, 2024).)

[2]    The term PA-IONI™ technology is broadly defined herein to encompass the actual spine navigation surgery technology as well as all of Mr. Goodwin's related confidential information, proprietary protocols, know-how and trade secrets, which Defendant Bell improperly published and seeks to improperly patent as her own.

in Defendant Bell's July 2017 article and July 2018 article as well as disclosed and claimed in U.S. Patent Publication No. 2021/0282857.

## INTRODUCTION

1.  This action stems from Defendants and particularly Defendant Bell fraudulently inducing Mr. Goodwin to enter into research agreements and disclose his proprietary and confidential PA-IONI™ technology for spine navigation surgery, which Defendant Bell then published without authorization and sought to covertly patent in her own name.

2.  Mr. Goodwin was inspired by his decades of experience in the medical device industry to invent his PA-IONI™ technology, which is a combination of non-ionizing photoacoustic imaging ("PA") and his patented Intra Osteal Navigation and Interrogation ("IONI")[3] ultrasound-based surgery guidance techniques ("PA-IONI™ technology") that offers a novel, safer, more efficient, real-time and affordable method to perform spine navigation surgery.

3.  Mr. Goodwin took his *fully conceived* PA-IONI™ technology to JHU in September 2016 for validation and proof of principle studies and to assist Mr. Goodwin in reducing his *inventive* PA-IONI™ technology to practice ("Studies"), which were performed at JHU by Defendant Bell and her student, Defendant Shubert, under two research agreements; namely, The Johns Hopkins University Bilateral Non-Disclosure Agreement dated October 3, 2016 (Ex. 1, "2016 NDA") and subsequently, the 2017 Sponsored Research Agreement (Ex. 2, "2017 SRA").

4.  At that time, Defendant Bell had just joined the JHU faculty as an assistant professor (July 1, 2016) and was forming the Photoacoustic and Ultrasonic Systems Engineering Laboratory ("PULSE lab").

5.  Upon information and belief, Defendant Bell was looking for a way to expand her

---

[3]    Mr. Goodwin had previously referred to this technology as IntraOsteal UltraSound ("IOUS™"), and he changed the name to IONI™.

spectrum of R&D activities to fund her new PULSE lab on her path to tenure, and apparently Mr. Goodwin's PA-IONI™ technology was a nice fit.

6.    In that regard, Defendant Bell provided express verbal and written **_assurances_**—which were repeated by JHU's IP Manager—to induce Mr. Goodwin into entering the 2016 NDA and 2017 SRA and disclosing his PA-IONI™. Defendant Bell expressly **_assured_** Mr. Goodwin verbally and in writing that (1) her academic work was limited to transcranial surgery applications, (2) she was not working on and would not work on spine navigation surgery technology for "someone else," (3) and would "take great care" to protect Mr. Goodwin's rights in his PA-IONI™ technology.

7.    Trusting JHU' reputation and Defendant Bell as JHU's designated Project Director, Mr. Goodwin (i) executed the 2016 NDA and 2017 SRA and (ii) disclosed his PA-IONI™ technology to Defendants Bell and student Shubert as well as other JHU Individuals[4] to perform the Studies.

8.    Mr. Goodwin continued trusting Defendant Bell even after he serendipitously discovered Defendant Bell's unauthorized publications, not believing that such a highly credentialed and decorated individual as Defendant Bell would be capable of the allegations alleged herein until he independently discovered the full extent of Defendant Bell's concealed patenting activities in earlier 2023.

9.    Shortly after completion of the Studies and publishing Mr. Goodwin's protected Confidential Information (under the 2017 SRA), Defendant Bell copied Mr. Goodwin's proposed patent application direct to PA-IONI™ technology (including a misspelling in the title) and

---

[4]    The term "Individual" when used in combination with an entity such as in "JHU Individual" or "A&K Spinal Individual" means an employee, agent, representative or the like associated with the identified entity.

claimed it to be her own in U.S. Provisional App. No. 62/699,483 ("the '483 provisional"). Defendant Bell, thereafter, filed U.S. Patent App. No. 17/260,943 (U.S. national phase, ("the '943 application")), which published as U.S. Patent Pub. 2021/0282857 ("the '857 publication"), all of which Defendant Bell actively concealed from Mr. Goodwin (collectively "the Concealed Applications").

10.     The timeline below identifies Defendant Bell's applications, with the Concealed Applications denoted in red text.



11.     Defendants' unauthorized publishing and concealed patenting activities, particular Defendant Bell's, culminated in Mr. Goodwin's loss of rights in his PA-IONI™ technology on October 7, 2022, when the USPTO Examiner rejected his pending PA-IONI™ patent claims over Defendant Bell's unauthorized July 2018 article.

12.     Although Mr. Goodwin believes that he is the sole inventor and owner of his PA-IONI™ technology, he concedes that he would likely be deemed a joint-inventor under Paragraphs 10.2(b)-(c) of the 2017 SRA because the invention was reduced to practice using JHU facilities—regardless of the contribution (or lack thereof) by Defendants Bell and Shubert. (*Id.*)

13.     Plaintiffs filed an earlier action in April 2024 (Civ. No. 1:24-cv-01217-MJM, D. Md.) alleging the same Counts, which was dismissed without prejudice on March 31, 2025 to mediate. (D.I. 28.)

14.     An in-person mediation was conducted on August 20, 2025, but no resolution was reached.

## THE PARTIES

15.    Plaintiff Mr. Goodwin is an individual domiciled at 2593 Willow Lane, Gilbertsville, Montgomery County, Pennsylvania.

16.    Plaintiff Cutting Edge Surgical is a Pennsylvania corporation having its principal place of business located at 2593 Willow Lane, Gilbertsville, Montgomery County, Pennsylvania.

17.    Upon information and belief, Defendant JHU is a private university based in Baltimore, Maryland.  Upon further information and belief, JHU is a corporation existing under the laws of Maryland having its principal place of business located at 3400 N. Charles Street, Baltimore, MD 21218.

18.    Upon information and belief, Defendant Bell is an individual domiciled at 6710 Fairford Lane, Baltimore, Baltimore County, Maryland.

19.    Upon information and belief, Defendant Shubert is an individual domiciled at 727 7th Street, Apt. 302, Los Angeles, Los Angeles County, California.

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1338, and supplemental jurisdiction over Plaintiffs' state law and common law claims, which arise from the same operative body of facts pursuant to 28 U.S.C. §1367(a)

21.    This Court also has subject matter jurisdiction over Plaintiffs' Declaratory Judgment claim seeking a declaration of that Mr. Goodwin is a joint-inventor and co-owner of the PA-IONI™ technology disclosed in Defendant Bell's July 2017 article, July 2018 article and disclosed and claimed in the '857 publication pursuant to 28 U.S.C. § 2201(a) and the Court's equitable powers.

22.    Defendants have rejected Mr. Goodwin's claims as a joint-inventor and offered to license the PA-IONI™ navigation surgery technology back to Mr. Goodwin on a royalty bearing basis, which gives rise to Declaratory Judgment jurisdiction.

23.    This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between Plaintiffs and Defendants as demonstrated in the Parties section below.

24.    This Court has personal jurisdiction over Defendant JHU because JHU is located in the State of Maryland and this judicial district and transacts business in the State of Maryland and this judicial district. This Court also has personal jurisdiction over Defendant JHU by virtue of Paragraph 18 of the 2017 SRA. (Ex. 2, *id.*)

25.    This Court has personal jurisdiction over Defendant Bell because she is located in the State of Maryland and this judicial district and transacts business in the State of Maryland. This Court also has personal jurisdiction over Defendant Bell by virtue of Paragraph 18 of the 2017 SRA. (Ex. 2, *id.*)

26.    This Court has personal jurisdiction over Defendant Shubert by virtue Paragraph 18 of the 2017 SRA. (Ex. 2, *id.*) Further, this Court has personal jurisdiction over Defendant Shubert because, upon information and belief, Defendant Shubert resided in Maryland and was employed by Defendant JHU at all times relevant, and he is continuing to receive benefits from his complained of conduct.

27.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(3).

<u>NATURE OF THE ACTION</u>

28.    The instant action comprises Count One: Breach of Contract, Count Two: Fraudulent Inducement, Count Three: Conversion, Count Four: Unfair Competition (Maryland common law), Count Five: Unfair Competition (Lanham Act) and Count Six: Declaratory Judgment that Mr. Goodwin is a joint-inventor and co-owner of his PA-IONI™ technology disclosed in Defendant Bell's July 2017 article, July 2018 article and disclosed and claimed in the

'857 publication.

## SPINE AND SPINAL FUSION SURGERY

29.     Spinal Fusion Surgery is also not one size fits all. There are different types of surgeries—each with its own set of unique complexities—depending upon the specific region of the spine and corresponding anatomy, including ACDF fusions and Pedicle Screw Fusions. A person of ordinary skill in the art would not consider these procedures interchangeable.

### Basic Spinal Anatomy and Bone Structure

30.     The human spine is a unique and complex structure made up of approximately thirty (33) bones called vertebrae, which are stacked to form the spinal column. Each vertebra includes several key anatomical features:

- **The vertebral body**, a large, rounded structure at the front (anterior);

- **The vertebral arch**, comprising several bony projections at the back (posterior);

- **The pedicles**, comprising two short bridges of bone that connect the vertebral body to the arch.

31.     Together, these structures form a hollow space called the spinal canal, which houses and protects the spinal cord, spinal nerves, and surrounding vascular and connective tissue.

32.     Structurally, each vertebra is composed of two types of bone:

- **Cortical bone** is dense, hard, and forms the outer shell of the vertebra. It has minimal blood supply and is biomechanically rigid.

- **Cancellous (or trabecular) bone** lies inside the cortical shell and is spongy, blood rich, and more compliant.

33.     One surgical option following treatment of spine pathology is spinal fusion—a procedure that permanently joins two or more vertebrae together to eliminate motion between

them at the affected segment.

34.    The surgical approach to spinal fusion—whether anterior (front), posterior (back) or lateral decubitus (side)—directly affects how the fusion procedure is performed and the level of complexity involved.

35.    Each approach offers different access to the spine and presents distinct anatomical and biomechanical challenges, and they are not interchangeable

<u>Current Techniques for Inserting Pedicle Screws</u>

36.    Because of their structural strength and location, vertebral pedicles are the preferred entry point for pedicle screw insertion. But they cannot be directly visualized, in the cervical, thoracic or lumbar spine regions, during surgery, and their small size and proximity to vital structures makes locating the "starting point" to insert screws technically complicated and demanding.



(Ex. 3, Goodwin September 7, 2017 email.)

37.     Historically, surgeons relied entirely on their anatomical knowledge and multiple 2D x-rays with a C-arm fluoroscope, to estimate the pedicle's location and the "starting point" (see above), which exposes both patient and OR team to high doses of radiation. After manually removing cortical bone to expose the cancellous "starting point," a surgeon then uses a blunt instrument—often called a gearshift—to "feel" their way through the spongy bone. This "freehand" method involves significant tactile judgment, brute force and carries the greatest risk of injury, particularly in the absence of real-time imaging.



38.     While there have been advances in computer-assisted surgical guidance, the current navigation techniques are bulky, technically complex, time-consuming to set up, expensive, and oftentimes require additional staff and can lengthen surgical procedures resulting in further radiation exposure. *Critically, they rely on pre-acquired images, which means they lack real-time or "on-the-fly" navigational feedback—a major limitation.*

## MR. GOODWIN'S BREAKTHROUGH PA-IONI™ TECHNOLOGY

39.     Mr. Goodwin is an inventor as well as President and sole owner of a small business, *Cutting Edge Surgical,* who spent decades in the medical device industry.

40.     Mr. Goodwin was inspired and impacted by his experiences and has long been

committed to making spinal fusion procedures safer. Specifically, Mr. Goodwin has focused on reducing complications caused by malpositioned screws, while also reducing the exposure of patients, surgeons and OR teams to harmful ionizing radiation.

41.    Mr. Goodwin's commitment was further strengthened by the recent diagnosis of a former business partner and renowned spine surgeon, who developed cancer believed to be linked to cumulative radiation exposure and was forced to stop operating.

42.    Mr. Goodwin's quest started in 1999/2000, collaborating with multiple academic institutions to explore potential solutions. At the cost of hundreds of thousands of dollars of his own money, Mr Goodwin's multi-year initiative culminated with his PA-IONI™ technology that he took to Defendant Bell to conduct the Studies.

43.    PA-IONI™ technology integrates two key systems (1) Mr. Goodwin's patented IONI™, an ultrasound-guided surgical technique,[5] and (2) a light-guided IONI™ surgical device known as the "Smart Surgical Tool," which offer operational and safety advantages.

44.    In the early 2000s, Mr. Goodwin formed BioSpinex, LLC ("BioSpinex"), where he produced a working prototype of the "Smart Surgical Tool" using a helium-neon (He-Ne) laser as its energy source in 2007. (Ex. 4, SBIR grant application; Ex. 5, Smart Surgical Tool PowerPoint.) The prototype was tested on a human cadaver specimen, and a related patent application was filed, which later published as U.S. Patent Publication No. 2009/0221922 on September 3, 2009. (Ex. 6, "the '922 publication.")

45.    Regarding PA-IONI™ in a nutshell, photoacoustic images are generated when

---

[5]    Mr. Goodwin's IONI™ technology is patented in U.S. Patent No. 6,579,244 (legally and duly issued to Mr. Goodwin on June 17, 2003) and U.S. Patent No. 6,849,047 (legally and duly issued to Mr. Goodwin on February 1, 2005). Both patents are titled "Intraosteal Ultrasound During Surgical Implantation," properly name Mr. Goodwin as sole inventor and are assigned to Cutting Edge Surgical.

non-ionizing laser light is absorbed by a target chromophore and converted into heat resulting in thermoelastic expansion and emission of ultrasound-range acoustic waves that are detected by a separate ultrasound transducer and processed using proprietary software and algorithms. The feedback provides surgeons with real-time instrument guidance with the potential to simultaneously interrogate the quality and composition of the biological tissues encountered. These capabilities enable surgeons to consistently locate and insert the pedicle screw in the optimal "starting point" with virtually perfect accuracy. (Ex. 7, Dr. Fayyazi Dec., ¶¶ 5–6.)

46.     PA-IONI™ employs non-ionizing light, which reduces exposure to harmful radiation to patients, surgeons and OR teams.

47.     Non-ionizing light is safer because it does not disrupt DNA and cause the harmful effects associated with the electromagnetic energy from the ionizing segment of the electromagnetic spectrum, e.g., x-rays.

48.     Not surprisingly, these benefits of Mr. Goodwin's PA-IONI™ are described in the '857 publication. (Ex. 8, '857 publication, ¶¶ [0015]-[0017].)

49.     These are desired by spinal surgeons. (*See* Ex. 9, Rothman Institute Orthopedics letter; Ex. 10, Dr. Drummond letter.)

### MR. GOODWIN APPROACHES DEFENDANT BELL

50.     By the early 2010s, Mr. Goodwin arrived at his ultimate hypothesis that photoacoustic light can penetrate tissue—particularly bone—and provide sufficient feedback to navigate within and interrogate the bone. Specifically, the feedback permits a surgeon to differentiate in real-time between cortical and cancellous bone within the vertebral pedicle (by density), which is a critical step in identifying the optimal "starting point" for pedicle screws. (*See* Ex. 11, Goodwin May 2, 2013 email to Dr. Cobbold; Ex. 12, Goodwin March 17, 2013 email to Amir Manbachi.)

51.    In early 2016, Mr. Goodwin came across Defendant Bell's 2015 article titled "*Localization of Transcranial Targets for Photoacoustic-Guided Endonasal Surgeries*," which discussed her photoacoustic imaging research in connection with guided ***transcranial surgery***.

52.    Although Defendant Bell's focus was fundamentally different, i.e., locating and detecting blood vessels—not differentiating bone density, like PA-IONI™—in transcranial applications, Mr. Goodwin believed that, with sufficient education and assistance, her experience in photoacoustic imaging could help refine his PA-IONI™ technology and give him a leg-up in commercializing the technology. Mr. Goodwin, accordingly, approached Defendants JHU and Bell in September 2016 to perform the Studies.

53.    The Studies were conducted under two research agreements predicated upon Defendant Bell's and JHU IP Manager Kerry Goodwin's ***assurances*** to Mr. Goodwin. The Studies first commenced under the 2016 NDA and continued thereafter under the superseding 2017 SRA, which added additional IP protections at Mr. Goodwin's insistence.

## THE 2016 NDA

54.    Recognizing from experience that IP is a critical component of commercialization, Mr. Goodwin was concerned about disclosing his PA-IONI™ technology. (*See* Ex. 13, Goodwin July 12, 2018 email.)

55.    In that regard, Cutting Edge Surgical and JHU entered into the 2016 NDA, which required identification to the "Provider's proprietary technology identified in **Appendix A**..." (Ex. 1, 2016 NDA, ¶ 2) (emphasis in original.)

56.    JHU identified Defendants JHU and Bell's "Provider's proprietary technology" as "***Transcranial*** *Photoacoustic Imaging for Guiding Skull Base Surgeries*," whereas Mr. Goodwin identified his "proprietary technology" as "*Proof of Principle Non Ionizing Light for Navigation in Bone*,"

12

which is directed to spine navigation surgery. ((Ex. 1, 2016 NDA, Appendix A) (emphasis added); see Ex. 7, Dr. Fayyazi Declaration, ¶ 4.)

57.     Mr. Goodwin relied upon Defendants JHU's and Bell's identification of her relevant "Providers proprietary information" and verbal representations confirming the limited scope of her academic work.

58.     The Studies kicked-off with phone calls and communications to answer Defendants Bell's and student Shubert's questions, which demonstrated their lack of basic knowledge and experience with fundamental spinal anatomy and spinal navigation surgery tools/instruments and techniques.

59.     To even enable Defendant Bell and her team to sufficiently understand PA-IONI™ technology and perform the Studies, Mr. Goodwin and his colleagues (Mr. Omar Mehdi and Dr. Amir Fayyazi, MD, a JHU alumnus and *an active fellowship trained spine surgeon*) first had to educate them regarding (i) rudimentary concepts such as general spine anatomy and physical properties of the various bone types comprising the vertebrae as well as (ii) current spine navigation surgery techniques, such as pedicle targeting, spine model use, mock pedicle access and specialized alignment techniques necessary for vertebral procedures. (Ex. 7, Dr. Fayyazi Dec., ¶¶ 4-7; Ex. 14, Mehdi Dec., ¶ 13.)

60.     Mr. Goodwin and his colleagues participated in the first in-person meeting at Defendant Bell's lab on December 23, 2016. (Ex. 14, Mehdi Dec., ¶ 12.) At the outset, Defendant Bell again *reassured* Mr. Goodwin that her academic work was limited to identifying potential benefits of photoacoustic imaging as a non-invasive technique for evaluating intercranial blood vessels in connection with transcranial surgery. (Ex. 7, Dr. Fayyazi Dec., ¶ 4; Ex. 14, Mehdi Dec., ¶ 9.)

61.     Mr. Goodwin and his colleagues then continued educating Defendants Bell and

student Shubert, providing additional basic knowledge and understandings regarding spine anatomy, including the bones comprising the vertebrae, and specifically the cornerstone of PA-IONI™ techniques—differentiating cortical and cancellous bone—by density. (Ex. 7, Dr. Fayyazi Dec., ¶¶ 4-7; Ex. 14, Mehdi Dec., ¶ 13.)

62.    Mr. Goodwin and his colleagues also demonstrated typical spine navigation surgery tools/instruments and their use in performing surgical techniques. Dr. Fayyazi specifically illustrated concepts, on a white board, including (i) locating and determining the "starting point" to insert a pedicle screw, (ii) how a spine surgeon cannulates a pedicle, (iii) typical surgical tools/instruments (e.g., a bone awls, drills) and (iv) and how to modify and adapt such tools/instruments to practice PA-IONI techniques. (Ex. 7, Dr. Fayyazi Dec., ¶¶ 4-7; Ex. 14, Mehdi Dec., ¶ 13.)

63.    The Studies showed promise, and Defendants Bell and JHU suggested continuing them under a more comprehensive Sponsored Research Agreement.

**DEFENDANTS' EXPRESS ASSURANCES TO INDUCE MR. GOODWIN TO ENTER INTO THE 2017 SRA**

64.    Mr. Goodwin still concerned with protecting his IP rights to facilitate[6] commercialization of PA-IONI™ technology, requested and received additional express *assurances* from Defendant Bell—in addition to the representations of the 2016 NDA—before agreeing to the 2017 SRA.

65.    Defendant Bell expressly *assured* Mr. Goodwin that Defendants would (i) "take great care" to protect Mr. Goodwin's IP rights and (ii) not work on spine navigation surgery technologies for "someone else." Defendant Bell reiterated her verbal *assurances* in an April 12,

---

[6]    Here, the benefits of the intellectual property rights as they pertain to commercialization are two-fold, the rights provide: (i) a *de-facto* Freedom to Operate ("FTO") and (ii) a potential source of revenue through licensing of the technology (if patented and commercialized).

2017 email.

> Mark and I spoke today, and I believe the attached document accurately reflects the outcome of our discussion. The yellow highlighted sections indicate sections where Mark initially requested changes, but after hearing my concerns about his changes and giving him the assurance that JHU will take great care to not let any potential IP slip away by publishing too soon without protection for both of us or by asking me to do the same work in Exhibit A for someone else, etc.

(Ex. 15, Defendant Bell April 12, 2017 email; cc JHU, Peter Kazandides, Donald Panda, Cora Mayenschein.)

66.    JHU personnel, and specifically, JHU Project IP Manager Kerry Goodwin, repeated Defendant Bell's false ***assurances*** to Mr. Goodwin's prospective business/commercialization partner A&K Spinal. (See ¶¶ 87-100 *infra*.)

> Purpose of this email is to remind you there is no benefit to debating your contribution to a public disclosure. Keep the emotions aside. Believe me, I am outraged, especially because we brought this topic up to Kerry on January 11th and he assured us that what Dr. Bell was presenting was a drill related to transcranial only. He was also assigned as the point person on Dr. Bells work with you and has severely jeopardized the possible path forward and Dr. Bell's credibility when it comes to sponsored work, etc etc etc. I could go on for pages. But instead, I am going to go for a quick run before this meeting so I can manage my frustration :)

(Ex. 16, S. Kurd February 15, 2018 email; Ex. 17, Zonies January 8, 2018 email.)

67.    Upon information and belief, this fraud extends to JHU institutionally given that JHU's Project IP Manager Mr. Kerry Goodwin reaffirmed JHU's designated Project Director, Defendant Bell's ***assurances***.

68.    At the very same time that they were making these ***assurances***, Defendants Bell and student Shubert were clandestinely preparing an article discussing PA-IONI™ technology, which published on July 17, 2017 under the title "A Novel Drill Design for Photoacoustic Guided Surgery," in the Society for PhotoOptical Instrumentation Engineers ("Bell July 2017 article"). (See Ex. 15, Defendant Bell April 12, 2017 email.)

69.    Defendants Bell and student Shubert's activities preparing the Bell July 2017 article coincided with their performing the Studies under the 2016 NDA. (*Id.*)

### THE 2017 SRA

15

70.    The 2017 SRA was effective June 30, 2017, superseded the 2016 NDA and incorporated several provisions relevant to Mr. Goodwin's instant claims.

71.    The 2017 SRA is a "continuing performance contract" having a "Period of Performance" commencing July 1, 2017 and ending December 31, 2017 along with a variety of performance obligations arising during the Period. (Ex. 2, *id.*, ¶ 2.)

72.    JHU designated Defendant Bell as "Project Director" for the Studies in the 2017 SRA. (*Id.*, ¶ 4.)

73.    Paragraph 8 titled "Confidentiality" limits dissemination of Confidential Information, including Mr. Goodwin's PA-IONI™ technology, to those JHU individuals who "have a need to know the information" and "who have been informed of the confidential nature of the information." (*Id.*, ¶ 8.2.)

74.    At the time of the 2017 SRA, much of Mr. Goodwin's PA-IONI™ technology was not yet public and fell within the definition of "Confidential Information," which Defendant Bell was ***expressly*** prohibited from publishing. (*Id.*, ¶¶ 8.1, 9.1.)

> 9.1    JHU shall have the right to publish and disseminate information derived from the Project, but not including the "Confidential Information" of Sponsor, as defined in Section 9.1 of this Agreement. However, this does not prevent JHU from publishing its research results or data.

(Ex. 2, 2017 SRA, ¶ 9.1) (emphasis added.)

75.    Mr. Goodwin relied upon this provision along with the Defendant Bell's express ***assurances***.

76.    Paragraph 9 titled "Publications" requires that "JHU shall furnish Sponsor with a copy of any proposed publication seven (7) days in advance of submission of the proposed publication for review and comment concerning Confidential Information" so that "Sponsor may request JHU to delay submission for publishing such proposed publication for a maximum of an

16

additional sixty (60) days <u>in order to protect the patentability of any inventions described</u> <u>therein</u>..." (Ex. 2, *Id.*, ¶ 9.2) (emphasis added.)

77.    In Paragraph 10 titled "Intellectual Property," the 2017 SRA requires that "JHU and Sponsor shall promptly provide a written disclosure to each other of any invention" and sets out the criteria for allocating ownership of an invention.  (*Id.*, ¶ 10.2.) The 2017 SRA also prohibited Mr. Goodwin from seeking patent protection without first coordinating with JHU. (*Id.*, ¶ 10.2(d).)

78.    Paragraph 19 titled "Waiver" of the 2017 SRA provides that "no waiver of any term or provision of this Agreement ... shall be deemed to be, or construed as, a further or continuing waiver of any such term or provision, or of any other term or provision, of this Agreement. (*Id.*, ¶ 19.)

## DEFENDANT BELL'S CONDUCT DURING THE STUDIES GAVE MR. GOODWIN NO REASON TO DOUBT HER ASSURANCES

79.    Defendant Bell's basic questions required to enable her and her team to perform the Studies clearly demonstrates that she and student Shubert did not have a definite and permanent idea of PA-IONI™ technology—if any idea—when she met Mr. Goodwin. Setting aside Mr. Goodwin's confidential PA-IONI™ technology, much of the information provided to enable her to understand PA-IONI™ was in the public domain and would have been well known to a person of ordinary skill in the art.

80.    Differentiating cortical and cancellous bone based upon their densities is the basic scientific principle enabling PA-IONI™ to provide real-time navigation surgery feed-back. (Ex. 7, Dr. Fayyazi Dec., ¶ 8.)

81.    Defendant Bell did not possess this basic skill or understanding. In her August 5, 2017 email, Defendant Bell points to pictures of a spine asking if she "had correctly identified the

cortical and cancellous regions" of the vertebra."



(Ex. 19, Defendant Bell August 5, 2017 email; see also Ex. 14, Mehdi Dec., ¶ 15.)

82.    In her follow up email, Defendant Bell inquired about basic spinal anatomy because she was admittedly "*Not too sure of the anatomy…*" and expressed frustration because she "found it difficult to drill in a straight line towards the cancellous region, which *[she] assumed is the same challenge facing surgeons.*" (Ex. 20, Defendant Bell August 15, 2017 email; see also Ex. 14, Mehdi Dec. ¶¶ 15-16) (emphasis added.)

83.    Defendant Bell and her lab, further, lacked access to the basic tools/instruments and tissue specimens required to perform the Studies, which Messrs. Goodwin and Mehdi provided. (*Id.*)

84.    The tissue specimens were delivered to Defendant Bell's lab less than two weeks later on August 28, 2017, and Messrs. Goodwin and Mehdi brought the requested surgical tools/instruments and demonstrated how (1) to prepare tissue specimens and (2) a spine surgeon would cannulate the pedicle during surgery. (Ex. 14, Mehdi Dec., ¶¶ 16-18.)

85.    Mr. Mehdi also demonstrated some of the then current "poor man's" guidance techniques, i.e., reliance on fluoroscopy, a type of intraoperative continuous or pulsed 2D x-rays, for spine surgery, specifically, showing various well-known fluoroscopy techniques to determine the "starting point" for insertion of a pedicle screw. (*Id.*, ¶ 18.)

86.    Mr. Goodwin also prepared a basic anatomy cheat-sheet comprising textbook

views with highlighted and labeled schematics of vertebral anatomy to assist Defendants Bell and student Shubert recognize and identify critical spinal structures and anatomy. (*Id.*, ¶ 19.)

## A&K SPINAL: MR. GOODWIN'S ATTEMPTS TO COMMERCIALIZE PA-IONI™

87.     As the Studies were wrapping up in late 2017, Mr. Goodwin was contacted by a former BioSpinex colleague, D. Greg Anderson, MD, who had subsequently founded A&K Spinal Instruments, Inc. ("A&K Spinal").

88.     Doctor Anderson inquired about Mr. Goodwin's work and was impressed with PA-IONI™. A&K Spinal and Mr. Goodwin explored a joint arrangement aimed at commercializing PA-IONI™.

89.     A&K Spinal found the 2017 SRA terms acceptable and moved forward proposing that the parties (i) prepare a rough business plan and partnership, with a pre-product commercialization exit for A&K Spinal, (ii) conducting preliminary due diligence/FTO and then fund raising to (iii) develop systems/equipment to perform spine navigation surgery employing PA-IONI techniques. (Ex. 18, S. Kurd January 26, 2018 email.)

90.     As part of the preliminary diligence/FTO, Mr. Goodwin (reasonably assuming himself to be a joint inventor and co-owner of PA-IONI™) sought to license any relevant IP rights owned by JHU as part of the A&K Spinal diligence. (Ex. 17, Goodwin January 3, 2018 email.)

91.     JHU indicated that there was "new JHU IP," but first required Mr. Goodwin to execute another NDA, which he did.

92.     When JHU identified the so-called "new JHU IP," Mr. Goodwin and A&K Spinal were shocked to learn that the "new JHU IP" comprised PA-IONI™ technology related materials that Defendants were obligated to previously disclose to Mr. Goodwin under the 2017 SRA.

93.     Specifically, the "new JHU IP" comprised a copy of the invention disclosure form, #DI4864 (submitted to JHU on July 2, 2017), and Defendant Bell's July 2017 article. (Ex. 18, S.

Kurd January 26, 2018 email.)

94.     Mr. Goodwin and A&K Spinal, we also surprised to learn that Defendant Bell—while *assuring* Mr. Goodwin—had been preparing her July 2017 article laying claim to PA-IONI™ technology at the same time as inducing Mr. Goodwin into the 2017 SRA.

95.     Upon information and belief, Defendant Bell—in addition to making knowing false assurances—misused Mr. Goodwin's PA-IONI™ technology gained under the 2016 NDA in preparing this July 2017 article.

96.     Ironically, it was Mr. Goodwin's attempt to commercialize his PA-IONI™ technology that exposed the tip of Defendant Bell's shenanigans

97.     On January 26, 2018, Mr. Goodwin and A&K Spinal Individuals met with Defendants and other JHU Individuals to discuss various issues, including IP and inventorship, and after the meeting, Mr. Goodwin and A&K Spinal Individuals understood that JHU was looking into and intended to reasonably resolve the inventorship questions.  (Ex. 18, S. Kurd January 26, 2018 email.)

98.     On March 13, 2018, Mr. Donald Panda of JHU responded to Mr. Goodwin, advising that he had spoken with Defendant Bell, who "was unaware of [Mr. Goodwin's] concern regarding the [2016] NDA and [2017] SRA."

99.     While Mr. Goodwin continued trusting Defendant Bell and tried working with her and JHU to resolve the inventor and ownership concerns, A&K Spine ultimately ended the collaboration with Mr. Goodwin when the issues could not be reasonably resolved.

100.     Upon information and belief, (i) Defendants Bell and Shubert's claims to be sole joint-inventors combined with (ii) JHU's claim of sole ownership of the PA-IONI™ technology, cast a pall over Mr. Goodwin's partnership with A&K Spinal because the anticipated *de-facto* protections of Mr. Goodwin's (presumed) role as a joint-inventor and co-owner of PA-IONI™

technology was not available.

## DEFENDANT BELL COPIED PORTIONS OF THE '483 PROVISIONAL DIRECTLY FROM MR. GOODWIN WITHOUT ATTRIBUTION

101.    At the same time, Defendant Bell and student Shubert were covertly preparing the '483 provisional disclosing Mr. Goodwin's PA-IONI™ technology, which they filed in their own names on July 17, 2018.

102.    JHU has acknowledged that the '483 provisional combines the information from the two invention disclosure forms submitted by Defendant Bell in connection the Studies. (Ex. 21, Gottlieb September 20, 2018 email.)

103.    The '483 provisional further incorporated materials that Defendant Bell and student Shubert copied directly from Mr. Goodwin.

104.    In the days leading to the expiration of the one-year grace period caused by Defendant Bell's unauthorized July 2017 article under 35 U.S.C. § 102, Mr. Goodwin—still trusting Defendant Bell and JHU's *assurances* and honesty and believing that he would be properly named a joint-inventor—implored JHU to file a broad provisional application to protect his PA-IONI™ technology.

105.    Mr. Goodwin always made it clear that his desire to see patent applications directed to PA-IONI™ technology was not a blanket authorization for JHU to file patent applications claiming his inventions in their names, but instead Mr. Goodwin's express desire was maintaining the patent rights (not letting the rights lapse), while resolving the inventorship misunderstanding.

106.    Days before the '483 provisional was filed on July 12, 2018, Mr. Goodwin provided a draft sample provisional application directed to methods of practicing PA-IONI™ surgical techniques. (Ex. 13, Goodwin July 12, 2018 email.)

107.    Defendant Bell with the assistance of student Shubert apparently took Mr. Goodwin's proposed application, slightly altered it, and brazenly filed it with the USPTO as Appendix C to the '483 provisional application claiming it to be their own. (Ex. 21, Gottlieb September 20, 2018 email.)

108.    While Mr. Goodwin does not make this charge lightly, three (3) authorship verification AI-platforms agree that Defendant Bell's Appendix C is based upon, derivative of and having 78% overall similarity to Mr. Goodwin's draft application. (Exs. 22-25.)

109.    Most telling, Defendant Bell copied Mr. Goodwin's title verbatim , down to the misspelling of "**starting**," in her Appendix C as shown below.

**APPENDIX C**

**METHOD TO LOCATE VERTEBRAL PEDICLE STARTNG POINT FOR IMPLANT PLACEMENT DURING SPINAL FUSION SURGERY**

**METHOD TO LOCATE VERTEBRAL PEDICLE STARTNG POINT FOR IMPLANT PLACEMENT DURING SPINAL FUSION SURGERY**

110.    This is not the only instance of copying in Defendant Bell's '483 provisional application. Appendix D thereto is Defendant Bell's July 2018 article, which surgeon Dr. Fayyazi observed "appears to be a direct copy of our discussion on December 23, 2016. The Methodology appears to follow what was proposed, described, and drawn on the whiteboard on December 23, 2016." (Ex. 7, Dr. Fayyazi Dec., ¶ 8.)

111.    Defendants did not provide Mr. Goodwin with any prefiling notice. Rather, JHU first advised Mr. Goodwin of the '483 provisional more than a month after it was filed on August 29, 2018, and withheld the application until September 20, 2018.

112.    Despite his requests for updates regarding prosecution, Defendants actively

concealed Defendant Bell's on-going activities seeking to patent the Concealed Applications, leaving Mr. Goodwin to speculate on whether JHU let the '483 provisional go abandoned.

## THE CONCEALED APPLICATIONS

113.    Defendants, particularly Defendant Bell, actively concealed the Concealed Applications, the '493 application that claims priority to the '483 provisional, and corresponding '857 publication.

114.    The below flow chart depicts (i) the current '483 provisional patent family, including the Concealed Applications boxed in red and (ii) Mr. Goodwin's '401 application and filings boxed in green.



115.    Still unaware of the Concealed Applications in October 2022, Mr. Goodwin, reached out to Defendant Bell to inquire into her interest in serving as a principal investigator on another SBIR project. In response, Defendant. Bell lauded her PA-IONI™ publications and gave Mr. Goodwin further false hope regarding inventorship referring to "**_our_** initial report introducing feasibility [of PA-IONI™] to the community." (Ex. 27, Defendant Bell October 15, 2022 email) (emphasis added.)

116.    Defendant Bell, however, intentionally remained silent regarding the pending Concealed Applications.

117.    Defendant Bell's active concealment of the Concealed Applications prevented Mr.

Goodwin from challenging inventorship under the USPTO's Derivation Proceedings pursuant to 35 U.S.C. § 135, which are intended to address and resolve this very such situation. *Webasto v. Bestop*, 2019 U.S. Dist. LEXIS 175005, at *9-10 (E.D. Mich. July 29, 2019) (quoting S. Rep. 110-259 (2008)).

118.    Upon information and belief, Defendants, particularly Defendant Bell, hoped to avoid an inventorship challenge under the Derivation Proceedings by Mr. Goodwin because the '857 publication—unlike an issued patent—does not enjoy a presumption of validity and accurate inventorship. (See 35. U.S.C. § 282.)

119.    Mr. Goodwin did not learn of the Concealed Applications until he independently discovered the '857 publication in early 2023 after the deadline to institute a Derivation Proceeding, while independently researching to improve PA-IONI™.

## EVEN KNOWING OF THE '483 PROVISIONAL, REASONABLE DILIGENCE WOULD NOT HAVE REVEALED THE CONCEALLED APPLICATIONS

120.    Upon learning of the '483 provisional application, Mr. Goodwin promptly contacted Mr. Gottlieb of JHU on September 30, 2018, and reiterated his concerns regarding Defendants Bell and student Shubert's claim of sole joint-inventorship of PA-IONI™ technology. (*See* Ex. 28, Defendant Bell December 20, 2018 email.)

121.    Even knowing of the '483 provisional and filing date, Mr. Goodwin's reasonable diligence could not have uncovered the Concealed Application from USPTO or other databases at that time.

122.    Under 35 U.S.C. § 122, information regarding the "patent family" (patents related to the provisional) is **NOT** publicly available—by law—when searching by provisional number until an application claiming priority thereto publishes. (See *Id.*; 37 CFR § 1.14.)

123.    The earliest to publish of the Concealed Applications was PCT/US2019/041839

on January 23, 2020, well over a year after JHU disclosed the '483 provisional to Mr. Goodwin.

124.    However, that does not mean that the '483 provisional (and information regarding the patent family) were available on the USPTO or other databases at that time.

125.    Neither Mr. Goodwin, nor the Examiner, located the '483 provisional or the Concealed Applications, in connection with prior art searches conducted as part of the preparation and prosecution of Mr. Goodwin's '401 application claiming PA-IONI™ technology.

126.    Mr. Goodwin's October 27, 2021, Information Disclosure Statement identifies Defendant Bell's July 2017 article, July 2018 article and unrelated U.S. Patent Pub. 2015/0223903 titled "Method and system for transcranial photoacoustic imaging for guiding skull base surgeries." (Ex. 29, Goodwin IDS.)

127.    The Examiner, likewise, did not locate '483 provisional or the Concealed Applications as demonstrated by his Search Strategy and Results (apparently run in September 2022) (Ex. 30, Examiner Search Strategy and Results.)

128.    Upon information and belief, a search with for the '483 provisional and patent family on the USPTO or other databases would not have yielded results until sometime after the Examiner's September 2022 Search Strategy and Results.

129.    A July 14, 2024 search of "Google patents®" with the '483 provisions received the following response: "Sorry, we couldn't find this patent number." (Ex. 31, Google search results.)

## MR. GOODWIN'S PA-IONI™ TECHNOLOGY IS NOVEL

130.    Unaware of Defendant Bell's concealed patenting activities and whether the '483 provisional was abandoned, Mr. Goodwin—free of the 2017 SRA prohibitions—filed his own provisional application directed to PA-IONI™ technology, U.S. Provisional No. 62/932,689, on November 8, 2019. Mr. Goodwin, then, filed U.S. Patent App. No. 17/092,401 on November 9, 2020, claiming priority to the '689 provisional and disclosing and claiming PA-IONI™

technology. (Ex. 32, "the Goodwin '401 application.")

131.    The Examiner rejected all of Mr. Goodwin's PA-IONI™ claims on October 7, 2022, as unpatentable under 35 U.S.C. § 102 (anticipated) and/or 35 U.S.C. § 103 (obvious) over Defendant Bell's July 2018 article, publishing Mr. Goodwin's confidential PA_IONI™ technology without authorization. (Ex. 33, October 7, 2022 USPTO Rejection.)

132.    This is not surprising because according to Dr. Fayyazi, Defendant Bell's July 2018 article "appears to be a direct copy of our discussion on December 23, 2016. The Methodology appears to follow what was proposed, described, and drawn on the whiteboard on December 23, 2016." (Ex. 7, Dr. Fayyazi Dec., ¶ 8.)

133.    The fact that the Examiner rejected Mr. Goodwin's PA-IONI™ claims over Defendant Bell's July 2018 article and not a patent document demonstrates the novelty of PA-IONI™.

134.    Further regarding novelty, industry observer, Dr. See Hee Han, called Defendant Bell's July 2018 article the first time "a clinically viable photoacoustic imaging approach to guide spinal fusion surgery" has been publicized, and described publishing Mr. Goodwin's PA-IONI™ technology as "promising." (See Ex. 34, Dr. Seung Hee Han, "Review of Photoacoustic Imaging for Imaging-Guided Spinal Surgery," Neurospine, 2018:15(4):306-322, p.318, accepted November 10, 2018.)

135.    Novelty of Mr. Goodwin's PA-IONI™ technology is again demonstrated by the European Patent Office's conclusions in PCT/US2019/014839, that pending method claims 16-20 reciting methods of performing spine navigation surgery using PA-IONI™ technology satisfied the patentability requirements of novelty and inventive step. (Ex. 35, p. 4/7, Written Opinion of the International Search Authority, § 1 "Statement.")

136.    Upon information and belief, there are currently no relevant third party issued

U.S. patents relevant to spine navigation surgery using PA-IONI™ technology that would have or would currently require a license to practice spine navigation surgery using PA-IONI™ technology, and tools/instruments for the same.

137.    As such, the only IP impediment to Mr. Goodwin's ability to commercialize his PA-IONI™ technology is Defendants' public claims of sole inventorship and ownership.

## DEFENDANT BELL HAS NEVER RECONCILED HER EXPRESS ASSURANCES WITH HER UNFOUNDED INVENTORSHIP CLAIMS

138.    After months of delays and numerous communications, Defendant Bell rejected Mr. Goodwin's overwhelming evidence of the significant contribution of PA-IONI™ technology and refused to acknowledge him as a joint-inventor. (Ex. 28, *Id.*)

139.    Upon information and belief, Defendant JHU as an institution should have engaged in or undertaken an independent inventorship analysis, but instead left the determination to Defendant Bell, the very person accused of misappropriating (and the person who has gained the most from omitting Mr. Goodwin as a joint-inventor) Mr. Goodwin's PA-IONI™ technology.

140.    Defendant Bell also readily admitted that her ***assurances*** were untrue claiming to have invented PA-IONI™ technology before meeting Mr. Goodwin based upon three "student emails" from 2013. (Ex. 28; Defendant Bell December 20, 2018 email, *see* student emails attached thereto.)

141.    The "student emails" and notes are simply a wish list and not sufficient to evidence "conception" of an invention.

142.    Defendants Bell and student Shubert's conduct has, further, been contrary to Defendant Bell's insistence that the "student emails" reflect "conception,"

143.    Defendant Bell has not even attempted to explain Defendant Shubert's

contribution (who she had not yet even met) as a joint-inventor under her version of the facts.

144.    Defendants Bell and student Shubert further did not include the student(s) as joint-inventors of the '483 provisional application or the '857 publication.

145.    Defendant Bell, moreover, has not identify this disclosure of her alleged invention as required under the Duty of Disclosure, Candor, and Good Faith. (37 C.F.R. § 1.56; MPEP 2001.)

146.    Upon information and belief, Defendant Bell held a postdoctoral fellowship at the time, and would have been required to disclose any such invention to the university at that time, which she did not do.

147.    During mediation, Defendant Bell appeared to have abandoned this "student email" justification, instead relying on a different, but equally unpersuasive argument.

## DEFENDANTS IMPROPERLY BENEFITED FROM MR. GOODWIN'S PA-IONI™ TECHNOLOGY

148.    Upon information and belief, Defendant Bell benefited and continues to benefit from publishing and claiming Mr. Goodwin's PA-IONI™ technology as her own by, inter alia, receiving (i) professional accolades, professional advancement, access to grants and other financial support, and speaking engagements, (ii) monetary remuneration and other payments to the extent any of the technology is commercialized and (iii) growth of applications for her the Pulse lab.

149.    Upon information and belief, Defendant Bell further benefited because the accolades, grants, publications and IP that she claims to have invented were materials and relevant to her gaining tenure on or about July 1, 2022.

150.    Upon information and belief, Defendant Shubert benefited and continues to benefit from publishing and claiming Mr. Goodwin's PA-IONI™ technology as his own as it (i) was materials and relevant to him receiving his current job, (ii) has accorded and accords him

professional accolades, professional advancement, access to grants and other financial support, and speaking engagements and (iii) has the potential for monetary remuneration and other payments to the extent any of the technology is commercialized.

151.    Upon information and belief, JHU IP Manager Mr. Kerry Goodwin benefited and continues to benefit from the misappropriation of Mr. Goodwin's PA-IONI™ technology by, inter alia, receiving (i) professional accolades and advancement, (ii) bonuses based upon publications and patents from projects that he is managing and (iii) monetary remuneration and other payments to the extent any of the technology is commercialized.

152.    Upon information and belief, Defendant JHU institutionally benefited and continues to benefit from the misappropriation of Mr. Goodwin's PA-IONI™ technology, inter alia, (i) reputationally as the faculty receives professional accolades (as noted above) and (ii) financially both through grants and research awards as well as monetary remuneration and other payments to the extent any of the technology is commercialized.

## DEFENDANT BELL KEPT THE TISSUE SPECIMENS TO CONTINUE CONDUCTING R&D, PUBLISHING AND HER COVERT PATENT ACTIVITIES

153.    Upon information and belief, Defendants Bell and student Shubert expected and realized benefits from misappropriating Mr. Goodwin's PA-IONI™ technology, and continued R&D activities after expiration of the 2017 SRA Period of Performance.

154.    Upon information and belief, Defendants Bell and student Shubert failed to return the specimens until August 9, 2019, over a year and a half after expiration of the specified Period of Performance. (Ex. 2, 2017 SRA, ¶¶ 2, 8.5, Ex. A thereto; Ex. 36, "Anatomy Gifts Registry" email.)

155.    Upon information and belief, Defendants Bell and student Shubert, continued experiments with the tissue specimens to further publish, patent and ultimately commercialize PA-IONI™ technology.

156.    Acknowledging the value of Mr. Goodwin's PA-IONI™ technology, Defendants continued publishing results and pursuing their clandestine patenting activities.

- Bell, "*Photoacoustic imaging for surgical guidance: Principles, applications, and outlook*", Journal of Applied Physics, 128, 060904 (2020) ("Defendant Bell's 2020 Publication").

- Bell *et al.*, "*Photoacoustic-guided surgery from head to toe*", Biomedical Optics Express, Vol. 12, No. 4, April 1, 2021 ("Defendant Bell's 2021 Biomedical Optics Publications").

- Bell *et al.*, "*Combined Ultrasound and Photoacoustic Image Guidance of Pedicle Cannulation 2021*", IEEE Transactions on Biomedical Engineering, Vol. 68, No. 8, August 2021 pp. 2480, 2487-88 (Ex. 37, "Defendant Bell's 2021 IEEE Publication").

- Bell *et al.*, "*Photoacoustic Imaging and Characterization of Bone in Medicine Overview Applications and Outlook*", Annual Review of Biomedical Engineering 2023. 25:207–32 (Ex. 38, "Defendant Bell's 2023 Publication").

157.    Upon information and belief, Defendants Bell and student Shubert provided Mr. Goodwin's PA-IONI™ technology, "Confidential Information" obtained under the 2017 SRA, to JHU individuals who did not "need to know" and were not subject to the 2017 SRA and who used Mr. Goodwin's PA-IONI™ technology outside the scope and purpose of the 2017 SRA without permission or authority.

158.    The Examiner's ultimate rejection of Mr. Goodwin's '401 application on October 7, 2022 in combination with Defendant Bell's unfounded refusal to credit Mr. Goodwin's substantial contributions of his PA-IONI™ technology was the first time Mr. Goodwin's opportunity to obtain patent rights protecting his PA-IONI™ technology, and all attendant

30

benefits of joint-inventorship and co-ownership, was foreclosed and extinguished.

### DAMAGE TO MR. GOODWIN

159.    Mr. Goodwin's loss of rights associated with being joint-inventor and co-owner of his PA-IONI™ technology on October 7, 2022 to Defendant Bell has resulted in loss of his investment of time and monies out of pocket as well as loss of goodwill and reputation as a patentee and innovator, which has hampered his ability to attract and maintain partnerships to commercialize his PA-IONI™ technology in the multimillion-dollar spine navigation surgery market.

160.    Regarding commercialization, A&K Spinal (or another commercialization partner), upon information and belief, would have continued to partner with Mr. Goodwin to commercialize his PA-IONI™ technology based upon the benefits and protections afforded by his joint-inventorship rights alone (regardless of whether a patent issued).

161.    Upon information and belief, Mr. Goodwin starting in 2017, as a recognized joint-inventor of PA-IONI™, would have completed R&D and had FDA 510(k) approval of a commercial spine navigation surgery systems/equipment using PA-IONI™ technology by 2024.

162.    A commercial version of a spine navigation surgery system/equipment employing PA-IONI™ technology would be subject to truncated FDA 510(k) approval, which only requires "a finding that a device is 'substantially equivalent' to a preexisting approved medical device." *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 765-66 (3d Cir. 2018).

163.    Other spine navigation surgery systems/equipment such as that subject to Brainlab's 510(k) Application No. K212245 took less than a year from submission to FDA approval. The Brainlab AG 510(k) Premarket Notification demonstrates a relatively short 510(k) approval period in that Brainlab's $ 510(k) application was received July 19, 2021, and the system

was approved April 13, 2022.[7] (Ex. 39, Brainlab's 510(k) Premarket Notification; Ex. 40, Brainlab FDA 510(k) approval letter.)

164.    Defendant Bell's latest publications, after the close of the 2017 SRA Period of Performance, support Mr. Goodwin's belief that he could have commercialized his PA-IONI™ technology by 2024.

165.    Defendant Bell stated in an August 2021 article that she and her team had "successfully demonstrated a complete system" using PA-IONI™ technology.  (*See* Ex. 33, Defendant Bell's 2021 IEEE Publication, pp. 2480, 2487-88.)

166.    Defendant Bell further boasted in a 2023 article that she had almost resolved all the technical impediments with PA-IONI™, and the remaining issue was a matter of calibration. (*See* Ex. 34, Defendant Bell's 2023 Publication, pp. 224-225.)

167.    Upon information and belief, the approximate size of overall global market for orthopedic navigation surgery systems/equipment was valued at $2.36 billion (USD) in 2022 and is anticipated to grow at rate of 12.5% (CAGR) from 2023 to 2030 to reach a value of $5.87 billion (USD).[8] Upon information and belief, the spine segment is expected to see the fastest rate of growth.[9]

---

[7]    We use Brainlab's 510(k) application by way of example because currently no one has an FDA approved spine navigation surgery system using PA-IONI navigation techniques.

[8]    Market data obtained from (https://www.grandviewresearch.com/industry-analysis/orthopedic-navigation-systems-market (last accessed April 24, 2024).)

[9]    (*Id.*)

168.    Upon information and belief, the approximate size of the global market for spine navigation surgery systems/equipment was $402.8 million (USD) in 2021 and is expected to grow at a rate of 18.6% (CAGR) to reach $1.3 billion (USD) in 2028.[10]

169.    Upon information and belief, the approximate size of the U.S. market for spine navigation surgery systems/equipment was $185 million (USD) in 2022 and is expected to grow at a rate of 12.4% (CAGR) and reach $459.8 million (CAGR) in 2030.[11]

170.    Upon information and belief, the approximate size of the global robotic spine surgery market was $163 million (USD) in 2022 and is expected to grow at a 12.60% rate (CAGR) and reach $537 million (USD) in 2032).[12]

## COUNT ONE – BREACH OF CONTRACT

171.    Plaintiffs incorporate by reference the allegations of Paragraphs 1 through 170 above, as if fully set forth herein.

172.    Mr. Goodwin executed the 2016 NDA on behalf of Cutting Edge Surgical in reliance upon Defendant Bell's identification of "Providers proprietary information" in Appendix A thereof.

173.    The 2016 NDA was a valid, binding, and enforceable contract that was superseded by the 2017 SRA, which was suggested by Defendants to further define the Studies.

---

[10]    Market data obtained from (https://idataresearch.com/product/spine-navigation-systems-market-global-medcore/ (last accessed April 24, 2024).)

[11]    Market data obtained from (https://www.grandviewresearch.com/industry-analysis/us-orthopedic-spine-navigation-systems-market-report (last accessed April 24, 2024).)

[12]    Market data obtained from (https://orthospinenews.com/2023/12/20/spine-robotics-market-size-worth-usd-537-million-in-2032-emergen-research/ (last accessed April 24, 2024).)

174.    Mr. Goodwin executed the 2017 SRA on behalf of Cutting Edge Surgical in reliance upon Defendant Bell's personal *assurances* repeated by JHU IP Manager Kerry Goodwin.

175.    The 2017 SRA was a valid, binding, and enforceable contract.

176.    Plaintiffs Cutting Edge Surgical and Mr. Goodwin as sole owner thereof are the owner of all rights, interests, and benefits under the 2017 SRA.

177.    Plaintiffs are also the sole owner of PA-IONI™ technology.

178.    Plaintiffs fulfilled their obligations under the 2017 SRA providing, inter alia, to JHU Individuals, including Defendants Bell and student Shubert (i) Mr. Goodwin's PA-IONI™ technology under protections, (ii) economic support, (iii) materials, including spine surgery tools/instruments, (iv) tissue specimens necessary to perform the Studies and (v) refraining from filing his own patent application until after the '483 provisional expired.

179.    Mr. Goodwin's PA-IONI™ technology is (i) the result of years of extensive R&D and expenditure of hundreds of thousands of dollars by Mr. Goodwin, (ii) a breakthrough navigation surgery technique and (iii) not publicly known.

180.    Defendants Bell and student Shubert and other JHU individuals published Mr. Goodwin's "Confidential Information" in, at-least, Defendant Bell's July 2017 article, July 2018 article and information Defendant Bell copied into the '483 provisional and Concealed Applications comprising Mr. Goodwin's PA-IONI™ technology in violation of, at-least, Paragraphs 8.1 and 9.1 of the 2017 SRA, which prohibit publishing a parties' "Confidential Information."

181.    Defendants Bell and student Shubert and other JHU individuals prepared and filed the '483 provisional without advising Mr. Goodwin in violation of, at-least, Paragraph 10 of the 2017 SRA.

182.    Defendants Bell and student Shubert and other JHU individuals prepared, filed and thereafter concealed the Concealed Application from Mr. Goodwin in violation of, at-least, Paragraph 10 of the 2017 SRA.

183.    These violations culminated in the Examiner ultimately rejecting Mr. Goodwin's pending PA-IONI™ claims in the Goodwin '401 application as unpatentable under either 35 U.S.C. § 102 (as anticipated) or 35 U.S.C. § 103 (as obvious) over Defendant Bell's July 2018 article on October 7, 2022.

184.    Upon information and belief, Defendants Bell and student Shubert claim to be sole joint-inventors of Mr. Goodwin's PA-IONI™ technology, because of, inter alia, the potentially huge economic benefit if the technology is commercialized and licensed, e.g., the annual revenues for the U.S. spine navigation surgery systems/equipment are in the hundreds of millions of dollars with expected double digit growth year over year until, at-least, 2030, and access to grants, professional advancement and on-going publishing opportunities.

185.    Defendants Bell and student Shubert's unfounded and uncorroborated claims to be sole joint-inventor(s) of Mr. Goodwin's PA-IONI™ technology in combination with Defendants Bell and Shubert's unauthorized articles and patent applications, have foreclosed and extinguished the possibility of Mr. Goodwin obtaining IP protection, much less recognition for his PA-IONI™ technology, including the *per se* FTO benefits of being a joint-inventor and co-owner, which would permit Mr. Goodwin to commercialize his technology without threats of infringement by Defendant JHU.

186.    Upon information and belief, Defendants' conduct, including that of Defendants Bell and Shubert, acting alone and in concert have been intentional, willful, and malicious.

187.     Plaintiffs have been and continue to be injured by Defendants' conduct, including that of Defendants Bell and student Shubert, such as improper and prohibited disclosure and misuse of Mr. Goodwin's Confidential Information comprising his PA-IONI™ technology.

188.     As a result of Defendants' violations of the 2017 SRA, Plaintiffs have suffered damages—including compensatory, expectation, benefit of the bargain and punitive—in an amount to be determined at trial, plus attorney's fees, costs, and interest.

## COUNT TWO – FRAUD

189.     Plaintiffs incorporate by reference the allegations of paragraphs 1 through 188 above, as if fully set forth herein.

190.     Mr. Goodwin executed the 2016 NDA on behalf of Cutting Edge Surgical in reliance upon Defendant Bell's identification of "Providers proprietary information" in Appendix A thereof.

191.     The 2016 NDA was a valid, binding, and enforceable contract that was superseded by the 2017 SRA, which was suggested by Defendants to further define the Studies.

192.     Mr. Goodwin executed the 2017 SRA on behalf of Cutting Edge Surgical in reliance upon Defendant Bell's personal *assurances* repeated by JHU IP Manager Kerry Goodwin.

193.     Specifically, Mr. Goodwin was induced to enter the 2017 SRA by Defendant Bell's *assurances*, including that (1) her academic research work was limited to "studying the potential benefits of photoacoustic as a non-invasive technique for evaluation of intracranial blood vessels," (2) she was not working on and would not work on spine navigation surgery technology for "someone else," (3) and would "take great care" to protect Mr. Goodwin's intellectual property.

36

194.    Upon information and belief, Defendant Bell and JHU IP Manager Kerry Goodwin knew the *assurances* to be false when communicated to Mr. Goodwin.

195.    Upon information and belief, Defendant Bell and student Shubert prepared Defendant Bell's July 2107 article at the same time as performing the Studies under the 2016 NDA.

196.    The 2017 SRA was a valid, binding, and enforceable contract.

197.    Plaintiffs Cutting Edge Surgical, and Mr. Goodwin as sole owner thereof, are the owner of all rights, interests, and benefits under the 2017 SRA.

198.    Plaintiffs are also the sole owner of PA-IONI™ technology.

199.    Plaintiffs fulfilled their obligations under the 2017 SRA providing, inter alia, to JHU Individuals, including Defendants Bell and Shubert (i) Mr. Goodwin's PA-IONI™ technology under protections, (ii) economic support, (iii) materials, including spine surgery tools/instruments, (iv) tissue specimens necessary to perform the Studies and (v) refraining from filing his own patent application until after the '483 provisional expired.

200.    Mr. Goodwin's PA-IONI™ technology is (i) the result of years of extensive R&D and expenditure of hundreds of thousands of dollars by Mr. Goodwin, (ii) a breakthrough navigation surgery technique and (iii) not publicly known.

201.    Defendants Bell and student Shubert and other JHU individuals published Mr. Goodwin's "Confidential Information" in, at-least, Defendant Bell's July 2017 article, July 2018 article and information Defendant Bell copied into the '483 provisional and Concealed Applications comprising Mr. Goodwin's PA-IONI™ technology in violation of, at-least, Paragraphs 8.1 and 9.1 of the 2017 SRA, which prohibit publishing a parties' "Confidential Information."

202.    Defendants Bell and student Shubert and other JHU individuals prepared and filed the '483 provisional without advising Mr. Goodwin in violation of, at-least, Paragraph 10

of the 2017 SRA.

203.    Defendants Bell and student Shubert and other JHU individuals prepared, filed and thereafter concealed the Concealed Applications from Mr. Goodwin in violation of, at-least, Paragraph 10 of the 2017 SRA.

204.    These violations culminated in the Examiner ultimately rejecting Mr. Goodwin's pending PA-IONI™ claims in the Goodwin '401 application as unpatentable under either 35 U.S.C. § 102 (as anticipated) or 35 U.S.C. § 103 (as obvious) over Defendant Bell's July 2018 article on October 7, 2022.

205.    Upon information and belief, Defendants Bell and Shubert are claiming to be sole joint-inventors of Mr. Goodwin's PA-IONI™ technology, because of, inter alia, the potentially huge economic benefit if the technology is commercialized and licensed, e.g., the annual revenues for the U.S. spine navigation surgery systems/equipment are in the hundreds of millions of dollars with expected double digit growth year over year until, at-least, 2030, and access to grants, professional advancement and on-going publishing opportunities.

206.    Despite the *assurances*, Defendant JHU, and specifically Defendant Bell, did not investigate Mr. Goodwin's joint-inventorship claim in good faith. Rather, Defendant Bell arbitrarily and capriciously denied Mr. Goodwin's claim without seeking advice of an IP professional or performing an evaluation of any sorts.

207.    Upon information and belief, Defendants JHU and Bell should have engaged in or undertaken an independent inventorship analysis, but instead left the inventorship determination to Defendant Bell, the very person accused of misappropriating (and the person who has gained the most from omitting Mr. Goodwin as a joint-inventor) Mr. Goodwin's PA-IONI™ technology.

208.    Defendant Bell's inventorship determination is arbitrary, capricious unfounded, uncorroborated and self-serving.

209.    Upon information and belief, JHU Individuals, including Defendants Bell and student Shubert, kept the tissue specimens after the 2017 SRA Period of Performance expired to conduct further R&D and publish additional academic articles based upon Mr. Goodwin's PA-IONI™ technology and receive the benefits therefrom.

210.    Upon information and belief, Defendants Bell and Shubert are claiming to be the sole joint-inventors of Mr. Goodwin's PA-IONI™ technology, because of, inter alia, the potentially huge economic benefit if the technology is commercialized and licensed, e.g., the annual revenues for the U.S. spine navigation surgery systems/equipment are in the hundreds of millions of dollars with expected double digit growth year over year until, at-least, 2030, and access to grants, professional advancement and on-going publishing opportunities.

211.    Defendants Bell and student Shubert's unfounded and uncorroborated claims to be sole joint-inventor(s) of Mr. Goodwin's PA-IONI™ technology in combination with their unauthorized publications and concealed patent applications, have foreclosed and extinguished the possibility of Mr. Goodwin obtaining IP protection, much less recognition for his PA-IONI™ technology, including the *per se* FTO benefits of being a joint-inventor and co-owner, including ability to commercialize his technology without threats of infringement by Defendant JHU.

212.    Upon information and belief, Defendants' conduct, including that of Defendants Bell and Shubert, acting alone and in concert have been intentional, willful, and malicious.

213.    Plaintiffs have been and continue to be injured by Defendants' conduct, including that of Defendants Bell and student Shubert, such as improper and prohibited disclosure and misuse of Mr. Goodwin's PA-IONI™ technology.

214.    As a result of Defendants' fraudulently inducing of Mr. Goodwin to enter into the 2017 SRA, Plaintiffs Cutting Edge Surgical and Mr. Goodwin have suffered damages—including compensatory, expectation, benefit of the bargain and punitive—in an amount to be determined at trial, plus attorney's fees, costs, and interest.

## COUNT THREE – CONVERSION

215.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 214 above, as if fully set forth herein.

216.    U.S. Patents and patent applications have an ownership interest as evidenced by an assignment(s) as well as attributes of personal property.  (35 U.S.C. § 261.)

217.    Upon information and belief, Mr. Goodwin made significant inventive contributions, of, at- least PA-IONI™ technology, to the claims of the '857 publication, and should enjoy an undivided ownership interest in the '857 publication and benefits thereof.

218.    Mr. Goodwin's PA-IONI™ technology, as disclosed in Defendant Bell's July 2017 article, July 2018 article and disclosed and claimed in the '857 publication constitutes independent economic value.

219.    Mr. Goodwin's PA-IONI™ technology, as disclosed in Defendant Bell's July 2017 article, July 2018 article and disclosed and claimed in the '857 publication are the result of years of extensive R&D and expenditure of hundreds of thousands of dollars by Mr. Goodwin, and is a breakthrough for spine navigation surgery that was not publicly known.

220.    Defendants Bell and student Shubert's claim to be sole joint-inventors of PA-IONI™ in both Defendant Bell's July 2017 article and July 2018 article is "inconsistent" with Mr. Goodwin's ownership rights in his PA-IONI™ technology.

221.    Defendants Bell and student Shubert's claim to be sole joint-inventors, along with Defendant JHU's claim to be sole owner of the '857 publication and offer to license the same to Mr. Goodwin and others is "inconsistent" with Mr. Goodwin's ownership rights in his PA-IONI™ technology.

222.    Defendants Bell and student Shubert's assignments of the (i) '483 provisional, (ii) '493 application and (iii) '857 publication to Defendant JHU is, likewise, "inconsistent" with Mr. Goodwin's ownership rights as a joint-inventor and co-owner of his PA-IONI™ technology.

223.    Defendants JHU, Bell and student Shubert's attempts to commercialize PA-IONI™ technology are also "inconsistent" with Mr. Goodwin's ownership rights as a joint-inventor and co-owner of his PA-IONI™ technology.

224.    Plaintiff Mr. Goodwin has advised Defendant JHU, specifically including Defendant Bell, of his significant contribution of PA-IONI™ technology to the claims of the '857 publication as well as any future claims directed spine navigation surgery, such that he should be named a joint inventor of the '857 publication. Defendant JHU, and specifically Defendant Bell, refuse to credit Mr. Goodwin's significant contribution.

225.    Plaintiffs have requested JHU to cease misusing, exploiting and otherwise converting Mr. Goodwin's PA-IONI™ technology, as disclosed in both Defendant Bell's July 2017 article, July 2018 article and disclosed and claimed in the '857 publication. Defendants have refused.

226.    Unless enjoined by this Court, Defendants JHU, Bell and student Shubert, as well as other JHU Individuals, will continue to convert Mr. Goodwin's PA-IONI™ technology, and thereby irreparably harm and damage Mr. Goodwin's goodwill and reputation, resulting in further impediments to his ability to commercialize his PA-IONI™ technology or other technology in the future.

227.    Plaintiffs are entitled to preliminary and permanent injunctive relief to prevent Defendants Bell and student Shubert's continued conversion of Mr. Goodwin's his PA-IONI™ technology.

228.    Defendants' conduct, including that of Defendants Bell and student Shubert, alone and in concert have been in bad faith, intentional, wanton and malicious, and have been taken in conscious disregard of Mr. Goodwin's rights and with the intent to deprive Mr. Goodwin of and convert his rights his PA-IONI™ technology, such that Defendants are also liable for punitive damages.

229.    Plaintiffs are entitled to damages—both compensatory and punitive—in an amount to be determined at trial, plus attorney's fees, costs, and interest.

## COUNT FOUR – UNFAIR COMPETITION (Maryland Common Law)

230.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 229 above, as if fully set forth herein.

231.    Mr. Goodwin's significant contribution of PA-IONI™ technology to both Defendant Bell's July 2017 article, July 2018 article and the claims of the '857 publication that recite methods and devices for performing spine navigation surgery, and he should receive such recognition, including being named a joint-inventor of the '857 publication having an undivided co-ownership interest therein.

232.    Mr. Goodwin's PA-IONI™ technology constitutes independent economic value.

233.    Mr. Goodwin's PA-IONI™ technology is the result of years of extensive R&D and expenditure of hundreds of thousands of dollars by Mr. Goodwin and is a breakthrough for spine navigation surgery that was not publicly known.

234.    Plaintiffs have sought and continue to seek to commercialize Mr. Goodwin's PA-IONI™ technology by offering to license it *back* to Mr. Goodwin.

235.    Defendants JHU, Bell and Shubert are improperly competing against Plaintiffs in seeking to commercialize and claiming Mr. Goodwin's PA-IONI™ technology as their own.

236.    Defendants' conduct, including that of Defendants Bell and student Shubert, acting alone and in concert have been intentional, wanton, and malicious, and have been taken in conscious disregard of Plaintiffs' rights, such that Defendants are also liable for punitive damages.

237.    Plaintiffs are entitled to damages—both compensatory and punitive—in an amount to be determined at trial, plus attorney's fees, costs, and interest.

<u>COUNT FIVE – UNFAIR COMPETITION (Lanham Act)</u>

238.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 237 above, as if fully set forth herein.

239.    Defendants' acts violate Section 43(a) of the Lanham Act, including 15 U.S.C. § 1125(a)(1)(A) and 15 U.S.C. § 1125(a)(1)(B).

240.    Defendants JHU, Bell and student Shubert have engaged in unfair competition by, among other things, making false representations that Defendants Bell and student Shubert are the sole joint-inventors of Mr. Goodwin's PA-IONI™ technology, including as disclosed in Defendant Bell's July 2017 article, July 2018 article and disclosed and claimed in the '857 publication.

241.    Such misrepresentations were made by Defendants for the purpose of promoting Defendant JHU, as well as Defendants Bell and student Shubert, in at-least, the academic world and industry.

242.    The statements described above (and others) constitute false or misleading statements regarding affiliation or connection, descriptions, characteristics, or impressions of Mr. Goodwin's PA-IONI ™technology.

243.    Upon information and belief, Defendants' conduct, including that of Defendants Bell and Shubert, acting alone and in concert have been intentional, willful, and malicious.

244.    Defendants JHU, Bell and student Shubert's statements are misleading to actual and potential marketing and commercial partners, e.g., the current potential customers of Goodwin's PA-IONI™ technology, and such statements have deceived, confused, or misled, or had the capacity to deceive, confuse, or mislead such customers.

245.    A&K Spinal is an example of one such partner that was deceived, confused and misled by Defendants' false claims.

246.    Upon information and belief, Defendants JHU, Bell and student Shubert's statements are material and likely to influence a customer's decision to invest in and/or acquire Mr. Goodwin's PA-IONI™ technology.

247.    Defendants' JHU, Bell and student Shubert's statements have proximately caused and/or are likely to cause injury to Plaintiffs by, among other things, diverting investment, sales, licenses, or other economic opportunities from Plaintiffs to Defendants or by stalling sales, licenses, or other economic opportunities of Mr. Goodwin.

248.    As a result of Defendants' false or misleading statements in the marketplace, Plaintiffs have suffered and will continue to suffer irreparable and monetary harm in an amount to be determined at trial.

249.    Plaintiffs have suffered and will continue to suffer direct monetary damages from the loss of partnering opportunities and licensing opportunities, licensing fees, and/or sales to customers who license the '857 publication as well as subject matter disclosed and claimed therein.

250.    Additionally, as a result of Defendants' fraudulent conduct, Plaintiffs are entitled to a trebling of their actual damages and is entitled to recover their attorneys' fees and costs

incurred in prosecuting this action.

251.   Upon information and belief, Defendants' acts of unfair competition injuring Plaintiffs will continue unless enjoined by the Court.

## COUNT SIX: DECLARATORY JUDGMENT

252.   Plaintiffs incorporate by reference the allegations of paragraphs 1 through 251 above, as if fully set forth herein.

253.   Plaintiffs also seek Declaratory Judgment that Mr. Goodwin is a joint-inventor and co-owner of the PA-IONI™ technology disclosed in Defendant Bell's July 2017 article, July 2018 article and disclosed and claimed in the '857 publication.

254.   Mr. Goodwin provided his PA-IONI™ technology, which Defendants Bell and student Shubert misappropriated by publication in their own name as well as seeking patents in their own name.

255.   Upon information and belief, Defendants' conduct, including that of Defendants Bell and student Shubert, acting alone and in concert have been intentional, willful, and malicious.

256.   Mr. Goodwin has suffered loss of reputation and goodwill as well as monetary losses directly attributable to Defendants' fraudulent conduct, and he is entitled to Declaratory Judgement that he is a joint-owner of his PA-IONI™ technology as disclosed in Defendant Bell's July 2017 article, July 2018 article and disclosed and claimed in the '857 publication.

## MISCELLANEOUS

257.   Plaintiffs reserve the right to assert inequitable conduct and/or fraud upon the U.S. Patent and Trademark Office against, at-least, Defendants Bell and Shubert after discovery.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek a judgment against Defendants JHU, Bell and student Shubert as follows:

a.     that Defendants intentionally and/or negligently breached the 2017 SRA;

b.     that Plaintiff Mr. Goodwin was fraudulently induced by, at-least, Defendant Bell's and Mr. Kerry Goodwin's *assurances* to enter into the 2016 NDA and subsequently the 2017 SRA and continue his performance thereunder, including foregoing the right to independently seek patent protection for his PA-IONI™ technology;

c.     that Defendants have converted Plaintiffs' rights in Mr. Goodwin's PA-IONI™ technology publishing it in their own names in Defendant Bell's July 2017 article and July 2018 article and claiming it as their own in the '857 publication;

d.     that Defendants have engaged in unfair competition under Maryland law against Plaintiffs;

e.     that Defendants have engaged in unfair completion under the Lanham Act against Plaintiffs;

f.     declaring that that Plaintiff Mr. Goodwin is a joint-inventor (as defined in the 2017 SRA) of his PA-IONI™ technology as disclosed in Defendant Bell's July 2017 article, July 2018 article and disclosed and claimed in the '857 publication;

g.     permanently enjoining Defendants from further publishing or seeking to commercialize Mr. Goodwin's PA-IONI™ technology in competition with Mr. Goodwin;

h.     awarding Plaintiffs compensatory and punitive damages in an amount to be determined at trial;

i.    awarding Plaintiffs their costs, disbursements, and reasonable attorney's fees in connection with this action; and

j.    awarding Plaintiffs such other and further relief as the Court may deem just and proper.

Dated: September 29, 2025                Respectfully Submitted,

By:/s/_____
William N. Sinclair (Bar No. 28833)
**SILVERMAN|THOMPSON|SLUTKIN| WHITE**
400 East Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 385-2225
(410) 547-2432
bsinclair@silvermanthompson.com


P. Branko Pejic (*pro hac vice forthcoming*)
Jill M. Browning (*pro hac vice forthcoming*)
**GREENBLUM & BERNSTEIN, P.L.C.**
1950 Roland Clarke Place
Reston, VA 20191-1411
(703) 716-1191
bpejic@gbpatent.com
jbrowning@gbpatent.com
mfink@gbpatent.com

*Attorneys for Plaintiffs Mark R. Goodwin and Cutting Edge Surgical Co., Inc. d/b/a Cutting Edge Surgical, Inc.*